**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **COMTIDE HOLDINGS, LLC,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 07-CV-01190** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **BOOTH CREEK MANAGEMENT CORP.,** | : | **Magistrate Judge Terrence P. Kemp** |
| | : | |
| **Defendant.** | : | |

## OPINION AND ORDER

### I. INTRODUCTION

This contract action is before the Court on Defendant Booth Creek Management Corp.'s

Motion for Summary Judgment (Doc. 75). For the reasons that follow, Booth Creek's Motion is

**GRANTED** in part and **DENIED** in part.

### II. BACKGROUND

#### A. Facts

In 2004, Booth Creek-affiliated companies owned four automobile dealership franchises

located in Silverthorne, Colorado and were looking to expand with the goal of acquiring

dealerships nationwide. In November 2004, Booth Creek approached Sam Schmidt about

purchasing the eight to ten dealerships Schmidt owned in Ohio and Tennessee. At the time of

Booth Creek's inquiry, Schmidt was not actively trying to sell his dealerships. Schmidt did,

however, take part in preliminary telephone conversations with numerous Booth Creek

employees, including Booth Creek's Principal George N. Gillett, Jr. In late November 2004,

Schmidt agreed to meet Gillett in New York to discuss further the prospect of Booth Creek

1

purchasing Schmidt's dealerships. Despite the New York meeting, the prospect of Booth Creek purchasing Schmidt's dealerships never progressed beyond preliminary discussions and the parties temporarily went their separate ways.

In February 2005, Schmidt's attorney, Stanley Shayne, inquired whether Schmidt would be interested in acquiring, for himself, a large multi-state dealership group in the northeast United States called Berlin City. At the time he approached Schmidt, Shayne was acting as the seller's broker for Berlin City. Schmidt contemplated the purchase but eventually determined that Berlin City was too large for him to acquire. Schmidt did, however, indicate to Shayne that he might know of an interested buyer: Booth Creek.

On February 25, 2005, Shayne, acting as Schmidt's attorney, sent a letter to Gillett with the hopes of negotiating a fee arrangement for Schmidt in exchange for Schmidt's identification of potential automobile dealerships for Gillett and Booth Creek to acquire. The following week Shayne sent Booth Creek a draft of a Broker Agreement that Schmidt and Shayne had prepared together. The terms of the draft proposed by Schmidt and Shayne included a 7.5% commission for Schmidt based on the "total consideration agreed" upon between Booth Creek and the seller of any dealerships identified by Schmidt. The draft also included a section with the heading "CLOSING," which restricted Schmidt's right to a commission to instances where Booth Creek "buys from, invests with, or manages operations for/with any SELLER produced by BROKER . . . during the contract term; or . . . within twenty-four (24) months of the term of this contract. . . ."

After receiving and reviewing the proposed Broker Agreement sent by Shayne, Booth Creek personnel revised the proposed terms. Changes to the proposed Broker Agreement included a reduction of the commission fee percentage from 7.5% to 5%, an explicit one-year duration for the contract, a shortening of the post-termination time frame from two years to one

year, and various other changes to the "CLOSING" section. After making these revisions, Gillett signed the Booth Creek version of the Broker Agreement and sent it to Schmidt and Shayne.

Shayne received the signed proposal made by Booth Creek, Shayne contacted Gillett to discuss the possibility of additional changes to the "CLOSING" section of the agreement. During their communications, Gillett indicated to Shayne that the draft sent by Booth Creek was Booth Creek's final offer. Two days after Gillett signed and sent Booth Creek's proposed Broker Agreement, Schmidt also signed it. Although Gillett signed the final Broker Agreement on March 7, 2005, and Schmidt signed the same agreement on March 9, 2005, the terms of the agreement state at the beginning that the Broker Agreement was "entered into on the 2nd day of March, 2005."

It was Gillett's understanding at the time he signed the Broker Agreement that the terms "buys," "invests in," and "manages operations for" all referred to a closing on the transaction and that the "CLOSING" section served the purpose of ensuring that there was a timely closing of the deal. It was Schmidt's understanding that the term "buys" meant the time in which a purchase agreement was entered into and signed between Booth Creek and the seller. Furthermore, Schmidt understood the "CLOSING" section to mean that the closing was the time when his fee was due, not when it was earned.

After the Broker Agreement was finalized and signed by both parties, Schmidt referred Booth Creek to Shayne for information about the Berlin City opportunity. Shortly after learning about Berlin City, Booth Creek began communications with Berlin City about its possible sale to Booth Creek. When negotiations between Booth Creek and Berlin City began, Berlin City was owned by a combination of a single majority shareholder, Daniel Dagesse, who owned 51% of the stock in the company, and an Employee Stock Ownership Program ("ESOP"), which owned

3

49%. As negotiations moved forward between Booth Creek and Berlin City, a number of obstacles arose which delayed the closing of the sale.

Of the obstacles and delays encountered by Booth Creek and Berlin City, the most prominent was a protracted audit by Department of Labor ("DOL") of Berlin City's ESOP, which implicated a possible $20 million company liability for Berlin City arising out of certain stock transactions engaged in by the ESOP. With the DOL issue unresolved, Booth Creek faced the prospect that the $20 million liability would potentially fall on it in the event it purchased the dealerships. As a result of the DOL issue, negotiations between Booth Creek and Berlin City were placed entirely on hold while awaiting a decision from the Department of Labor.

In the March 7, 2007 Agreement, the parties included a specific contingency provision identifying the DOL audit as an unresolved "condition precedent" to Booth Creek's obligation at closing. In late July 2007, Booth Creek and Berlin City negotiated an alternative arrangement wherein Booth Creek waived the condition and Dagesse agreed to place approximately $10 million in escrow to cover the liability arising from the DOL audit.

In addition to the DOL audit, a number of other issues contributed to the delay in closing. During the period of negotiations, Berlin City's majority shareholder, Dagesse, was suffering from health problems that resulted in at least one period of hospitalization. Dagesse's personal temperament was also an obstacle to the timely negotiations between Booth Creek and Berlin City. A further delay was caused by Degasse's premature start to Toyota's manufacturer approval process. The premature application to Toyota caused Toyota to have concerns about the transaction, adding to the delays. Ultimately Toyota did approve Booth Creek as a purchaser.

Another delay arose after Booth Creek and Berlin City had entered into their initial Stock Contribution and Purchase Agreement in November 2006, when Booth Creek learned of a $29

4

million tax gain built into the real estate held by Berlin City. The additional $29 million cost required Booth Creek to restructure the agreement to purchase the dealerships. Because of the tax gain issue, Booth Creek was unable to finance the purchase of the real estate associated with the Berlin City Dealerships and the real estate was purchased by a third party Capital Automotive REIT.

One of two final delays was a number of substantial issues that arose between Dagesse and the Berlin City ESOP. As late as May of 2007, disagreements between Dagesse and the ESOP over the amounts of money that would be required to be put into escrow put the transaction in jeopardy. The disagreement over the escrow funds prompted Dagesse to contact Gillett and others conveying his feeling that the deal was "off." Also contributing to the delay in transactions between Booth Creek and Berlin City was the disputes that arose between Shayne and Dagesse over the terms of Shayne's own broker agreement with Berlin City. A final agreement between Dagesse and Shayne was not reached until July 2007.

Booth Creek and Berlin City ultimately entered into a Stock Contribution and Purchase Agreement on November 10, 2006. The parties subsequently entered into an Amended and Restated Stock Contribution and Purchase Agreement on March 7, 2007. It was not until August 3, 2007 that Booth Creek closed on the Berlin City purchase.

On June 13, 2007, Schmidt contacted Booth Creek to congratulate Gillett on the upcoming closing of the Berlin City transaction and to demand payment of his broker's fee payment when he received the letter from Schmidt, Booth Creek executive vice president Jeffrey Joyce conducted an investigation into the validity of the Broker Agreement and as to whether it had expired. Booth Creek determined that it would not initially respond to Schmidt's demand for his broker's fee payment.

5

On August 3, 2007, Booth Creek and Berlin City closed the transaction for Booth Creek to acquire the Berlin City Dealerships. The closing was not a traditional closing where the parties assembled in person, but instead consisted of a series of wire transfers. The final purchase price paid by Booth Creek to Berlin City for the acquisition of the Berlin City Dealerships was $86,000,000. Schmidt has demanded he be paid a broker's fee of $4,300,000. Booth Creek has to this date refused to pay any fee to Schmidt.

### B. Procedural History

This action began when Plaintiff Comtide filed a Complaint against Defendant Booth Creek in the Franklin County Common Pleas Court on October 2, 2007 (Doc. 3). The state case was removed by Booth Creek to this Court on November 19, 2007 (Doc. 2). Comtide filed an Amended Complaint on January 28, 2008 (Doc. 15), and Booth Creek filed a Motion to Dismiss on March 3, 2008 (Doc. 20).

On May 22, 2008, this Court granted Booth Creek's Motion to Dismiss, finding that Comtide was not entitled to recover Schmidt's broker's fee because the Brokers Agreement called for payment of a fee upon closing, so long as the closing occurred within the term of the agreement or within twelve months after its expiration. *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, 554 F. Supp. 2d 821, 826 (S.D. Ohio 2008) ("Comtide I"). The Court found that because Booth Creek purchased Berlin City seventeen months after the expiration of the contract, Schmidt was not entitled to a broker's fee and Booth Creek did not breach its contract. *Id*. This Court also dismissed Comtide's claims of breach of fiduciary relationship, equitable relief, fraud, and reformation. *Id.* at 826–30.

On May 29, 2008, Comtide filed a Notice of Appeal to United States Court of Appeals for the Sixth Circuit (Doc. 33). On July 7, 2009, the Sixth Circuit reversed the trial court's

dismissal of all claims against Booth Creek. *See Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, 335 F. App'x 587 (6th Cir. 2009) ("Comtide II"). The Sixth Circuit held that the term "buys" as used in the Broker Agreement between Booth Creek and Schmidt was ambiguous. *Id.* at 589. The resolution of the ambiguity requires interpretation and fact finding as to what the parties intended. *Id.* The issue of breach of contract was the only issue addressed by the Sixth Circuit on appeal.

Following the Sixth Circuit's reversal, the case was remanded back to this Court. Booth Creek brought this Motion for Summary Judgment on May 6, 2011, arguing that it is entitled to summary judgment as a matter of law on all of Comtide's claims (Doc. 75). The matter has been fully briefed and submitted at oral argument. It is now ripe for review.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir. 1993). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. But the non-moving party "may not rest merely on allegations or denials in its own

7

pleading." Fed. R. Civ. P. 56(e)(2); *see also Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co*., 8 F.3d 335, 339–40 (6th Cir. 1993). When ruling on a motion for summary judgment, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, the Court may rely on the evidence called to its attention by the parties. *Id*.

## IV. LAW AND ANALYSIS

Booth Creek first argues that the undisputed extrinsic evidence demonstrates that "buys" refers to the closing of the transaction. If so, then Schmidt was not entitled to a commission. Second, even if "buys" referred to the signing of a purchase agreement, the contents of the purchase agreement between Booth Creek and Berlin City show that Booth Creek had not "bought" Berlin City as of March 2007. Third, Comtide cannot recover under the theory that Booth Creek "invested in" or "managed operations for" Berlin City within the relevant time period. Finally, Booth Creek argues that this Court's prior rulings on Comtide's non-contract claims are undisturbed by *Comtide II*, and that, in the alternative, it is entitled to summary judgment on each of those claims.

### A. Breach of Contract (Count I)

#### *1. Meaning of "Buys"*

Comtide claims that Booth Creek breached the terms of the Broker Agreement by failing to pay the commission Schmidt earned by facilitating Booth Creek's purchase of Berlin City.

The Broker Agreement between Schmidt (the "Broker") and Booth Creek (the "Buyer") entitles Schmidt to a five percent commission payable in the following circumstances:

> CLOSING. Broker shall receive reasonable notice of the closing. The
> BROKER'S fee referred to in Paragraph 4 above is payable in full to the
> BROKER only upon closing of the escrow/settlement account and payment of the
> consideration to SELLER, and the BROKER shall be paid his fee when such
> consideration is paid, if BUYER buys from, invests in, or manages operations for
> any SELLER during the term of this agreement, or within twelve (12) months
> after the termination of this agreement if the BUYER was advised of the SELLER
> by Broker before termination of this agreement and before BUYER learns of such
> SELLER from any other source.

Whether Comtide, as Schmidt's successor in interest, may recover a commission for Booth Creek's purchase of Berlin City depends upon the meaning of "buys." The Sixth Circuit has held that "buys" in the Broker Agreement is "confusing and ambiguous." *Comtide II*, 335 F. App'x at 589. In particular, the use of "buys" in the context of the "CLOSING" paragraph could reasonably mean "that Schmidt was entitled to claim a commission provided that Booth Creek bought the Berlin City dealership within twenty-four months of March 9, 2005, but was not entitled to actually receive it until the closing took place; or, . . . [that] he was entitle to receive his fee and was entitled to payment of the fee at the time of closing." *Id.*

In Ohio,[1] extrinsic evidence is required for the interpretation of an ambiguous contract term. *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996) (citing *Shifrin v. Forest*

---

[1] This case arises under diversity jurisdiction. A federal court sitting in diversity jurisdiction must apply the contract law of the forum state. *See Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003). Accordingly, Ohio law governs the interpretation of this contract.

*City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio 1992)). Resolution of an ambiguity is a question of fact for the jury. *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1262 (Ohio 2003). Under Rule 56, however, if the extrinsic evidence is undisputed and reveals the contract to have but one reasonable meaning, summary judgment may be entered. *See Cole v. ArvinMeritor, Inc*., 549 F.3d 1064, 1070 (6th Cir. 2008) ("If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper."); *Lewis v. Mathes*, 161 Ohio App. 3d 1, 10 (Ohio Ct. App. 2005) ("Ordinarily, summary judgment is inappropriate when contractual language is ambiguous because a question of fact remains. But, if the extrinsic evidence demonstrates that no genuine issue of material fact exists, we conclude that summary judgment may still be appropriate.") (citation omitted); *Cincinnati Ins. Co. v. ACE INA Holdings, Inc.*, 175 Ohio App. 3d 266 (Ohio Ct. App. 2007) (syllabus) (affirming summary judgment because extrinsic evidence resolved the ambiguity). *But see Wells Fargo Bank, N.A. v. LaSalle Bank N.A.*, 643 F. Supp. 2d 1014, 1030 (S.D. Ohio 2009) (holding that summary judgment is inappropriate if relying on extrinsic evidence to resolve meaning of ambiguous contract).

Booth Creek argues that the undisputed evidence demonstrates Comtide may only claim his commission under the Broker Agreement if Booth Creek and Berlin City closed the deal within twenty-four months of the effective date of the Broker Agreement. Since the closing occurred twenty-nine months after the effective date of the Broker Agreement, Comtide is not entitled to a commission. Comtide argues that the date of closing is the date upon which he Schmidt was entitled to receive payment but *not* necessarily the date upon which Booth Creek "bought" Berlin City. Although the closing occurred more than twenty-four months after the date

of the Broker Agreement, Booth Creek bought Berlin City no later than March 7, 2007, when it entered into the final purchase agreement, within the twenty-four month window.[2]

Booth Creek's principle evidence in support of its interpretation of "buys" comes from three major revisions Booth Creek made to the original draft Shayne prepared. First, in Shayne's version, Booth Creek had to pay Schmidt a 7.5% commission "on the total sales price or total consideration agreed." Though still payable upon closing, the commission in Shayne's version was linked *either* to the time of payment *or* the time of the sale agreement. In Booth Creek's counteroffer, which became the final agreement, Booth Creek had to pay Schmidt a 5% commission "on the total consideration paid." Booth Creek's version thus focused the commission on the time of payment, eliminating the link to the time of the agreement.[3]

Second, Booth Creek made several changes to the "CLOSING" paragraph that narrowed the events that would cause the commission to be due. Shayne's version reads in relevant part as follows:

> The BROKER'S fee . . . is payable in full to the BROKER *upon closing* of the
> escrow/settlement account, *upon possession* of the premises by the BUYER, *or*
> *upon occupancy* under management contract by the BUYER, the BUYER'S
> assignees or BUYER'S representatives. *Any money received by the SELLER* other

---

[2] Booth Creek has argued that even the March 7, 2007, date is too late for Comtide to recover as the Broker Agreement was effective as of March 2, 2005. Although the Broker Agreement does state in one place that it was "entered into on the 2nd day of March, 2005," it states on the page with the signatures that the Agreement was "signed and agreed to on Mar 7, 2005." Even without the testimony from the witnesses who stated that the parties signed the Agreement on or after March 7, the Agreement alone is enough to create a genuine dispute of material fact on the question of the date from which the twenty-four month window begins.

[3] Comtide argues based on Schmidt's deposition testimony that there was no difference between the consideration agreed and the consideration paid. This argument misses the mark. Schmidt's testimony reveals his understanding about whether consideration agreed and consideration paid were for the same amount, not whether the changes in the language affected the time at which his commission vested.

than the money held in any escrow account, shall be deemed a closing, and the

BROKER shall be paid his fee in full at that time.

Booth Creek's version reads in relevant part as follows:

The BROKER'S fee . . . is payable in full to the BROKER *only upon closing* of

the escrow/settlement account and payment of the consideration to SELLER, and

the BROKER shall be paid his fee when such consideration is paid . . . ."

Shayne's draft established Schmidt's commission vested in three situations: closing, possession,

or occupancy. Booth Creek's version reduced the vesting events to one: closing. This change

thus supports Booth Creek's position that the intent of the Parties was to make Schmidt's

commission contingent upon closing.

Third, Booth Creek shortened the period under which Schmidt could earn his

commission. Shayne's draft proposed that Schmidt's commission would be earned "if BUYER

buys from, invests with, or manages operations for/with any SELLER *within twenty-four (24)*

*months* of the term of this contract who was produced or contacted by BROKER during the life

of this contract." Booth Creek's version changed the italicized language to "within twelve (12)

months," revealing, according to Booth Creek, the premium placed upon a swift closing and an

intent to strictly cabin Schmidt's right to a commission.[4]

Booth Creek argues on the basis of these revisions that the Parties intended to tie

Schmidt's commission to the date of closing and only the date of closing. Conversely, Booth

Creek points to the absence of evidence suggesting that the Parties intended to bifurcate the date

---

[4] Schmidt testified at deposition that he understood that the window for him to earn his commission to be the same in both versions of the contract: twenty-four months. The Court does not interpret the language of the first draft in the same way as Schmidt. Regardless, Booth Creek's reading is plausible and supports its argument concerning the Parties' intent.

upon which the commission was *earned* from the date upon which it was *paid*, rendering Comtide's interpretation of the contract implausible and without evidentiary support.[5]

Comtide retorts not that the extrinsic evidence entitles it to summary judgment but that summary judgment is inappropriate as the extrinsic evidence does not remove the ambiguity from "buys." As counterpoints to Booth Creek's evidence of the drafting revisions, Comtide points to the testimonies of Walter Hall and Schmidt as well as to the email of August 13, 2007, all of which support a finding that "buys" includes the signing of a purchase agreement and not just closing.

Schmidt testified in his deposition that he understood "buys from" to mean "go into contract," that a party had "bought the dealership when [it] sign[ed] the contract." Hall, an expert in the automotive dealership industry,[6] corroborates Schmidt's understanding. He testified at deposition that the industry standard for brokers is that the broker's services "are complete at the moment at which the broker brings the buyer and seller together." When a buyer and a seller sign a purchase agreement, "the buyer is considered to have bought the dealerships, according to industry standards, custom, and practice." Furthermore, according to Hall, "the buyer's broker's commission is considered earned when . . . a buyer has entered into a buy-sell agreement during the term of the broker's agreement."

Comtide argues that Hall's testimony regarding the automotive industry is consistent with Ohio law on brokerage contracts, as "it is fundamental law in Ohio and generally throughout the

---

[5] Booth Creek additionally argues that the "buys" should be construed against Comtide as that term was drafted by Shayne on behalf of Schmidt. *See Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996) ("Finally, a contract is to be construed against the party who drew it."). The Court declines to do so in this case as the sentence and paragraph in which "buys" appears is the result of the drafting efforts of both Parties.

[6] Because the Court must view the evidence in the light most favorable to Comtide, it assumes without deciding Hall's status as an expert.

nation that a real estate broker is due payment in full of his commission upon the execution of a contract to sell, even if the buyer subsequently defaults or the transaction is never consummated." *Wilson v. Harris*, No. 13507, 1993 Ohio App. LEXIS 1415, *14–15 (Ohio Ct. App. Mar. 10, 1993) (citing *Cincinnati M & M Realty, Inc. v. Uckotter*, 235 N.E.2d 719, 179 (Ohio 1968) (syllabus), and Restatement (Second) of Agency § 445, cmt. d (noting that broker "is entitled to his commission if he finds such a customer who enters into an oral agreement with the principal")); *see also Chapman v. Petersen*, No. 93OT064, 1994 Ohio App. LEXIS 4462, *7 (Ohio Ct. App. Sept. 23, 1994) ("[A] contract provision directing payment at the time of closing does not create a condition precedent to the seller's obligation to pay, but fixes only a convenient time for payment.").[7] This default position does not, of course, prevent the parties to a brokerage contract from agreeing to different terms, including conditioning the earning of a commission upon closing. *In re Gagne*, 16 B.R. 24, 26 (Bankr. N.D. Ohio 1981) (citing *Harley E. Rouda & Co. v. Springtime Co.,* 359 N.E.2d 450, 453 (1975) (noting that rule entitling real estate broker to commission when seller enters enforceable contract with buyer "may be varied by agreement of the parties"). Nevertheless, this law lends credibility to Hall's testimony, which together make Comtide's interpretation of "buys" more plausible.

Comtide contends, moreover, the legal definition of "buy" and "purchase" support its more expansive reading of "buy" in the Broker Agreement. Black's Law Dictionary defines "buy" as "[t]o acquire the ownership of property by giving an accepted price or consideration

---

[7] Booth Creek points out that Schmidt can also be viewed as a finder, someone who "brings parties together for a transaction that they themselves negotiate and consummate." *Legros v. Tarr*, 540 N.E.2d 257, 262 (Ohio 1989). In Ohio, the default position regarding finders and brokers differs. *See id.* Brokers are entitled to commissions regardless of whether the deal is ultimately consummated. *Id.* "On the other hand, in the absence of contractual terms to the contrary, a finder is entitled to a commission or fee only if his introduction results in a transaction . . . ." *Id.* Thus there is support for Booth Creek's position that hinging Schmidt's commission upon closing only is consistent with standard business practices.

therefore; or by agreeing to do so." Black's similarly defines "purchase": "The term 'purchase' includes any contract to purchase or otherwise acquire."

Finally, Comtide relies on an email dated August 13, 2007, between Jeff Joyce and Jennifer Stenseth Rogus. Attached to the email is a spreadsheet calculating the amount of a commission that would be owed on the deal and questioning, "How much of a fee do you want to pay them as good faith?" According to Joyce's deposition testimony, the question was directed at Gillett. Comtide argues that this document reveals Booth Creek's position that it never understood "buys" to refer exclusively to closing to be disingenuous, creating at the least a question of material fact precluding summary judgment.

The Court concludes that both Parties have produced extrinsic evidence that supports their interpretation of "buys." A reasonable jury could find that the revisions in the final version of the Broker Agreement reveal that the Parties intended to make the earning of a commission contingent upon closing. It could also find that the standard practice in the industry and the common legal definition of "buy" and "purchase" support Schmidt's understanding that "buys" included either closing or the signing of an agreement. In sum, the evidence does not "conclusively resolve the issue" and "summary judgment is improper." *Cole*, 549 F.3d at 1070.

### 2. Evidence that Booth Creek "Bought" Berlin City

Booth Creek next argues that the contents of and events surrounding the November 2006 and May 2007 purchase agreements reveal that it cannot be said that Booth Creek "bought" Berlin City at those times.

The Court must begin by clarifying the import of the Sixth Circuit's statement that [t]he purchase agreements and other extrinsic evidence may shed some light on what the parties intended 'buys from' to mean, and what, if any, other condition applied to Schmidt's entitlement

15

to his fee." *Comtide II*, 335 F.App'x at 589. The Parties debate whether the nature of the purchase agreements between Booth Creek and Berlin City from November 2006 and March 2007 demonstrate that Booth Creek had "bought" Berlin City at either of those times. But the question posed by the Sixth Circuit was more fundamental: do the purchase agreements resolve the meaning of "buy" in the Broker Agreement? The question cannot be whether the purchase agreements constitute "buying" simply because the definition of "buying" has not yet been established.

The Parties' arguments on this question only reveal the extent to which disputes of fact remain on the meaning of "buys." Booth Creek points to the language in the purchase agreements and the understanding of the parties to the Berlin City purchase agreements that the purchase had only occurred upon closing. Comtide interprets these facts differently: The fact that conditions subsequent existed did not render the purchase agreements anything other than binding contracts for sale causing his commission to vest. On this record, the Court cannot grant summary judgment.[8]

### 3. Evidence that Booth Creek "Invested In" or "Managed Operations For" Berlin City

Comtide argues that Booth Creek "invested in" Berlin City. Joyce testified that Booth Creek paid for some of the expenses Berlin City incurred in relationship to its potential sale to Booth Creek. Hall has testified that at least some of these expenses "were the responsibility of Berlin" and, in his opinion, constituted an "investment." But Hall's testimony is only relevant if the contract is ambiguous, which it is not. According to its ordinary meaning, "invests" means "[t]o make an outlay of money for profit." Black's Law Dictionary (9th ed. 2009). As Booth Creek points out, covering some of Berlin City's transactional costs does nothing to contribute to

---

[8] **JUDGE:** In this section, I proposed an alternate method of framing this issue. I am attaching my original draft for your comparison. Let me (or really, Lauren) know which you prefer.

its revenue stream but merely acts as an incentive to keep the deal progressing. The Court does not find that the evidence regarding when Booth Creek "invested in" Berlin City to warrant a denial of the motion for summary judgment.

Comtide next argues that Booth Creek "managed" Berlin City. Joyce testified at deposition that Booth Creek entered into an employment agreement with Rod Buscher in December 2006. Booth Creek hired Buscher "[t]o help manage the larger dealership group that [it] expected to build." That group included Berlin City. Around this same time, Gillett was talking with Buscher and others about "management related issues and transition issues." Gillett testified that Buscher was "around" or "was in the process of transitioning in" by August 2006. According to Joyce, Berlin City and Booth Creek shared management teams as part of the transitional process.

Booth Creek argues that all of this evidence concerns plans made in anticipation of the transition in management rather than an actual change in management of current operations. Booth Creek is correct that there is evidence supporting its position that Booth Creek and Berlin City began planning for the management transition within the twenty-four month period but had not actually effected that transition until after the period of the Broker Agreement had expired. Joyce, for example, testified that it hired Buscher to manage the group that it "expected" to build. Gillett likewise testified that Booth Creek brought Buscher and others on board to manage Berlin City and other dealerships "[a]t the point when we would have owned them."

By December 31, 2006, Buscher had gained managerial control of a number of Booth Creek's operations per a Management Agreement between two Booth Creek subsidiaries. Comtide emphasizes this agreement as evidence that Buscher on behalf of Booth Creek was managing Berlin City by that time. The agreement, however, does not specifically include Berlin

17

City and thus does not answer the question of when Booth Creek began managing Berlin City. As Gillett explained, the Management Agreement established that "[a]fter the transaction closed, they [including Buscher] were going to be overseeing the business."

Nevertheless, there are portions of the Joyce and Gillett depositions that make the transition appear less crisp and delineated than Booth Creek's characterization would have the Court believe. What is clear is that the preparation for the transition and the transition itself spanned many months. The record is ambiguous as to at what point Booth Creek or its agents assumed managerial responsibilities over Berlin City. The Court therefore must **DENY** Booth Creek's motion for summary judgment on Count I.

### B. Non-Contract Claims (Counts II through V)

This Court previously dismissed Comtide's non-contract claims for breach of a fiduciary duty, equitable relief, fraud, and reformation. *Comtide I*, 554 F. Supp. 2d at 826–30. Booth Creek argues that the Court's rulings on these counts was not disturbed by the Sixth Circuit's reversal of its dismissal of Count I. The Sixth Circuit did not address any claim but the contract claim. *See generally Comtide II*, 335 F. App'x 587. The only error that the Sixth Circuit found concerned this Court's conclusion on the contract claim. *See id.* at 591. The court held as follows: "We hold that the contract is ambiguous as a matter of law and that the judgment as a matter of law for the defendant was inappropriate. Consequently, we REVERSE the district court's judgment and REMAND for further proceedings." *Id.*

According to the law of the case doctrine, "a legal decision made at one stage of a civil or criminal case . . . becomes the law of the case for future stages of the same litigation." *United States v. Bell*, 988 F.2d 247, 250 (citing *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C.Cir. 1987); *United States v. Duchi*, 944 F.2d 391, 393 (8th Cir.

1991)); *see also United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994). Once a decision

has been made, the doctrine "precludes a court from 'reconsideration of identical issues.'"

*Hanover Ins. Co. v. American Engineering Co*., 105 F.3d 306 (6th Cir. 1997) (quoting *Petition of*

*United States Steel Corp*., 479 F.2d 489, 493 (6th Cir.), *cert. denied*, 414 U.S. 859 (1973)).

Important policy concerns support this doctrine, including "stability in the decisionmaking

process, predictability of results, proper working relationships between trial and appellate courts,

and judicial economy." *Bell*, 988 F.2d at 250 (quoting *United States v. Rivera-Martinez*, 931

F.2d 148, 151 (1st Cir.), *cert. denied*, 502 U.S. 862 (1991)).

  One specific application of this doctrine is the mandate rule, which "requires lower courts

to adhere to the commands of a superior court" on remand. *United States v. Moored*, 38 F.3d

1419, 1421(6th Cir. 1994) (citing *Bell*, 988 F.2d at 251 (1st Cir. 1993)). According to this rule, a

lower court may not consider questions that the appellate court's mandate has indisputably

answered. The court may, however, rule on issues that the superior court has left open or

unanswered. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939) ("The general

proposition that [the lower court] was bound to carry the mandate of the upper court into

execution and could not consider the questions which the mandate rule laid at rest-is

indisuptable.").

  Remands can take two forms: general or limited. "Limited remands explicitly outline the

issues to be addressed by the district court and create a narrow framework within which the

district court must operate. General remands, in contrast, give district courts authority to address

all matters as long as remaining consistent with the remand." *United States v. Campbell*, 168

F.3d 263, 265 (6th Cir. 1999) (internal citations omitted).

In the case *sub judice*, the Court concludes that the Sixth Circuit's remand was limited. The Court's judgment was overturned only on the ground that the contract claim required further fact finding before a judgment could issue. Nor can the Court say that a reversal of the dismissal of the contract claim necessarily implies a reversal of the other claims as they are analytically distinct. That is, the Court's determination that the non-contract claims should have been dismissed under Rule 12(b)(6) was not dependent upon its determination that the contract claim should have been dismissed. Since the claims are wholly independent, the Court's ruling on the motion to dismiss the non-contract claims is still valid and in effect. Under the law of the case doctrine, therefore, the Court **REAFFIRMS** its holding in *Comtide I*, 554 F. Supp. 2d at 826–30, regarding Counts II through V.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part Defendant Booth Creek's Motion for Summary Judgment (Doc. 75). Counts II through V are hereby **DISMISSED**.

IT IS SO ORDERED.

/s/Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**United States District Court Judge**

**DATE: November 14, 2011**

20